U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUN 3 0 2005

ROBERT H. SHEMWELL, CLERK
BY_____
        DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MARGARET HAYS-BARMANN                    CIVIL ACTION NO. 04-0827

versus                                   JUDGE WALTER

COMMISSIONER OF THE SOCIAL               MAGISTRATE JUDGE HORNSBY
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

### Introduction

Margaret Hays-Barman ("Plaintiff") filed the current application for Disability Insurance Benefits in 1996. ALJ Nancy Griswold denied the claim, but the Appeals Council vacated the decision and remanded for further proceedings. ALJ Charles Lindsay conducted those proceedings and again denied the application. Plaintiff returned to the Appeals Council, which vacated the decision and again remanded. The Appeals Council erroneously concluded that the case had been previously remanded to the ALJ that heard the case the first time, so it directed that the case be assigned to another ALJ. (Tr. 390-92). The case was then (once again) assigned to ALJ Nancy Griswold, who conducted another hearing and reviewed the evidence.

The ALJ analyzed the claim pursuant to the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 (governing claims for Disability Insurance Benefits) and described in

Barnhart v. Thomas, 124 S.Ct. 376, 379-80 (2003). She found that Plaintiff was not engaged in substantial gainful activity (step one) and suffered from severe impairments (step two) in the form of fibromyalgia, degenerative joint disease of the cervical spine, osteoarthritis, and anxiety and depression, but the impairments were not severe enough to meet or medically equal one of the listed impairments (step three) that would result in a finding of disability without further evaluation.

The ALJ then assessed Plaintiff's residual functional capacity ("RFC") and concluded that she had the ability to perform light work activity, reduced by an inability to constantly/repetitively use the hands and moderate limitations in maintaining attention and concentration for extended periods. She then assessed whether that RFC permitted Plaintiff to perform her past relevant work (step four). She concluded that Plaintiff was not disabled because she was capable of performing the demands of her past work as a shipping clerk and cashier. (Tr. 9-20). The Appeals Council found no reason to review the ALJ's decision (Tr. 2-4), and Plaintiff filed this judicial appeal pursuant to 42 U.S.C. § 405(g). For the reasons that follow, it is recommended that the Commissioner's decision be reversed and the case be remanded to the agency for further proceedings.

**Standard of Review; Substantial Evidence**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is

more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Asserted Errors**

Plaintiff's complains that the ALJ incorrectly concluded that Plaintiff retained the RFC to perform light work (subject to limitations noted above) in the face of contrary medical evidence and without complying with the Appeals Council mandate to determine all severe and non-severe impairments and give further consideration to the claimant's RFC and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations. See Tr. 391. Plaintiff also complains that the ALJ did not assign appropriate weight to the medical evidence, erred in finding Plaintiff not credible, and erred in finding Plaintiff was capable of performing her past work.

The evidence reviewed by the ALJ includes reports from a number of consultative and examining physicians and mental health professionals who examined or treated Plaintiff between 1995 and the most recent agency decision in 2003. The record also includes a transcript of Plaintiff's testimony at the hearing. The evidence will be summarized below, and then the issues raised by Plaintiff will be addressed (to the extent necessary).

**Medical Evidence**

Internist Judy Laviolette, M.D., is Plaintiff's primary treating physician. In August 1994, about one year before Plaintiff alleges the onset of disability, Dr. Laviolette diagnosed cervical spine disease, fibromyalgia and depression. (Tr. 193). Plaintiff was examined and treated by Dr. Laviolette several times over the following months for problems ranging from sinusitis to chronic pain. A diagnosis of irritable bowel syndrome was noted in May 1995. (Tr. 183-92). Plaintiff complained in July 1995 of chronic neck, shoulder and back pain, an inability to sleep, abdominal pain, diarrhea, chronic headaches, right upper-extremity pain and numbness, diffuse muscle pain, and generalized weakness and fatigue. (Tr. 182). She reported that she was unable to perform routine duties associated with her job and was unable to walk, sit or stand for extended periods of time. Dr. Laviolette adjusted Plaintiff's medications and advised her to pursue a disability evaluation. Her impression was fibromyalgia syndrome. Id.

Plaintiff continued to periodically visit Dr. Laviolette and showed little improvement. A physical examination in October 1995 found a full range of motion in the right arm/shoulder, but the examination elicited pain. (Tr. 178-80). An MRI of the cervical spine in October 1995 indicated bony spurs from the vertebral bodies and minimal posterior disk protrusion C5-6 and C6-7 causing anterior effacement of the thecal sac. (Tr. 177). A few days later, Dr. Laviolette noted that Plaintiff's status was unchanged and that she remained unable to return to work. (Tr. 176). She also certified to Plaintiff's employer that Plaintiff

was unable to return to work for an indefinite time. (Tr. 174). Plaintiff continued visiting Dr. Laviolette and receiving medications in the following months. In March 1996, Dr. Laviolette referred Plaintiff to physical therapy and a pain management clinic. (Tr. 171). Observations of Plaintiff's condition remained about the same in future visits, but in June 1996, Dr. Laviolette noted a diminished range of motion in Plaintiff's right shoulder. (Tr. 168).

Dr. Laviolette completed an RFC assessment form in July 1996 and concluded that Plaintiff could lift less than ten pounds, stand/walk less than two hours per day, sit less than six hours per work day, and was limited in her ability to push or pull with her upper or lower extremities. (Tr. 202-203). Plaintiff was limited to occasionally bending or climbing, and she was prohibited from balancing, kneeling, crawling or other such postures. She was also found to be limited in her ability to reach, handle, finger or feel, and she was deemed required to avoid certain environmental situations such as extreme cold, heat or working at heights or around machinery. That assessment, if accepted, would mean Plaintiff was capable of less than even sedentary work. The ALJ dismissed the assessment as "very inconsistent" with Dr. Laviolette's own evaluations and the diagnostic evidence, so it was "afforded little to no weight." (Tr. 12).

Rheumatologist Larry Broadwell, M.D., issued a report in August 1996 after examining and treating Plaintiff. (Tr. 142). He found tender points in locations consistent with fibromyalgia, but Plaintiff also had a positive forehead sign that is often seen in patients

who are exaggerating or malingering. X-rays showed evidence of mild narrowing at C5-6, compatible with mild degenerative disk disease. Dr. Broadwell opined that Plaintiff had fibromyalgia, but there was a significant psychological or emotional component present. With respect to functional capacity, Dr. Broadwell opined that Plaintiff would have problems with any type of repetitive motions and would experience pain with neck bending, lifting over 10 to 15 pounds, or repeated flexion of the lower back. He suggested that a psychiatric evaluation might be necessary to determine the exact level of disability. (Tr. 142). The ALJ, when discussing this report, emphasized the signs of exaggeration and the mild nature of the disk problems. (Tr. 12).

Psychologist Mark Dulle, Ph.D., conducted a consultative examination in September 2006. (Tr. 110-12). He diagnosed dysthymic disorder, late onset, with anxiety features, and personality disorder NOS with somatoform disorder features. His prognosis was fair, and he concluded that Plaintiff's "depression and anxiety do not appear sufficiently debilitating to keep her from gainful employment and appear directly linked to her physical condition for which apparently there is some medical support." Id. at 112.

Plaintiff was treated at the Schumpert Pain Care Center. In September 1996, she received a spinal injection (stellate ganglion block) in an effort to treat what was described as intractable right upper-extremity pain. (Tr. 161-62). The limb was described as cold and sensitive to cold or light touch and having a mottled appearance. Dr. Glenn Sholte saw Plaintiff after the injections. (Tr. 156-60). Plaintiff reported that the injection helped for

a couple of days, but the pain returned to a large degree. Plaintiff reported previous treatment with acupuncture, several courses of physical therapy, massage and exercise, most of which worsened rather than improved her pain. (Tr. 157). Plaintiff reported frequent dropping of objects from her right hand and said she had been falling a great deal recently. She also reported numerous other problems, including excessive sweating, intestinal problems, migraine headaches and depression. Plaintiff had a decreased range of motion in her neck, but a full range of motion in all four extremities. (Tr. 158). She did demonstrate decreased pinprick sensation, as well as loss of touch and temperature sensation in her right hand and forearm. Dr. Sholte's impression was chronic pain syndrome (fibromyalgia), anxiety, depression, and irritable bowel syndrome. (Tr. 159). He recommended pool therapy, medication and trigger point injections. Id.

Plaintiff attended several counseling sessions with Maria O'Brien in 1996 and 1997. (Tr. 220-33). Notes from the sessions indicate that Plaintiff was open and cooperative in efforts to address her problems. After a visit in October 1996, Ms. O'Brien wrote that she found Plaintiff to be feeling better both physically and mentally, and she noted that Plaintiff said she was happy because she had recently married. (Tr. 230). A January 1997 note recorded that Plaintiff's "fibromyalgia has cleared up but in working through some of the stressors, the patient understands the exacerbation." (Tr. 221). During another visit, however, Plaintiff was reported as having "extreme pain behavior" and as being "most uncomfortable" during the session. (Tr. 227). The ALJ's discussion of the therapy noted

only the report of Plaintiff's happiness associated with her marriage and that her *"fibromyalgia had cleared up."* (Tr. 13) (Emphasis in original.)

Thomas Staats, Ph.D., conducted a consultative examination in February 1997. (Tr. 216-19). He noted that a pain test indicated Plaintiff was an "exaggerating pain patient." (Tr. 216). Women with similar scores usually do not have positive physical findings on objective tests but nonetheless respond in the extreme with stress and disability, and they usually do not benefit from surgery or traditional medical treatments. Plaintiff's broad pattern of symptoms indicated a pain disorder associated with psychological factors and a general medical condition affecting a general medical condition. (Tr. 217). Plaintiff appeared to "have a definite psychosomatic component to her problems." A personality profile test indicated "some over-dramatization of symptoms" that is common to persons with psychosomatic and/or somatoform disorders and depression. Dr. Staats concluded that Plaintiff suffered from major depressive disorder, dysthymic disorder, generalized anxiety disorder, pain disorder associated with both psychological and medical factors, and a personality disorder. (Tr. 219). He also diagnosed fibromyalgia, and he assigned a GAF score of 60, 75. Id. The ALJ, in discussing this report, emphasized the indications of exaggeration and over-dramatization. (Tr. 13).

Plaintiff visited Dr. Kathleen Majors in March 1997 and reported a pain score of 8 to 9/10. (Tr. 195). Plaintiff had failed to appear for her last four scheduled pool therapy sessions, claiming sickness on one occasion and stating that pool therapy in the past had not

offered relief. Plaintiff was compliant with the chronic pain program and was enjoying it. She complained of sleep-related problems. Her medication was adjusted.

Dr. Richard Williams, a psychiatrist, examined Plaintiff in March 1997 at the request of the pain management clinic. (Tr. 206). He opined that Plaintiff "has a dysthymic disorder associated with her chronic pain from fibromyalgia." He explained to Plaintiff why she developed fibromyalgia and that treatment expectations for her were dependent upon her identifying and dealing with underlying feelings of anger. He also believed that Plaintiff could benefit from muscular, water and emotional therapies.

In May 1997, Plaintiff was complaining in particular of pain in her right neck, right shoulder and right upper arm, all of which seemed different from her usual fibromyalgia pain. Dr. Majors administered another round of spinal injections (stellate ganglion blocks) and ten trigger point injections. (Tr. 211-12). The procedure was repeated a week later, together with a right shoulder injection. (Tr. 209-10). More injections were given on May 21 (Tr. 296-97) and May 28 (Tr. 207). An epidural steroid injection was administered in September 1997 to treat recently increased symptoms of neck and arm pain. (Tr. 291-92).

Ronald Goebel, Ph.D., conducted a neuropsychological evaluation of Plaintiff over the course of three days in July 1998. (Tr. 275-78). He conducted a number of tests, including several designed to detect overt malingering. There was no evidence of malingering, and the test results were considered valid. (Tr. 275). Plaintiff recounted her medical history and said she would like to work, but nothing had helped her to date. (Tr. 276). She said she could not hold a job because her symptoms are unpredictable, she

experiences chronic fatigue, she has irritable bowel syndrome, she has chronic headaches and joint pain, and she cannot concentrate for any appreciable length of time. (Tr. 276-77). Her Full Scale IQ Score was 101. (Tr. 277). Other tests indicated a mild degree of organic brain impairment, mild cognitive rigidity, mildly inefficient learning and reasoning skills, but an adequate ability to attend and concentrate. Another test yielded results often found in persons who unconsciously convert psychological problems into physical symptoms. Dr. Goebel said that one could speculate that at least some of Plaintiff's physical symptoms may not be due to fibromyalgia. (Tr. 278). He said he could not state, strictly from a neuropsychological point of view, that Plaintiff was disabled from performing all gainful activity, but he said he could not comment on whether she was disabled for physical reasons such as her complaints of chronic pain. He deferred to medical physicians on that issue. His expectation for her recovery was "extremely guarded," and he characterized Plaintiff's desire to reenter the work force as "wishful thinking." Id.

Plaintiff was seen several times in 1998 and 1999 by Nurse Practitioner Callie Sexton and Dr. Laviolette. She continued to complain of fibromyalgia, insomnia and related problems. There was no improvement by January 2000. Plaintiff was observed during one visit as having a flat affect and crying in the office. (Tr. 309). During a visit in April 2000, Plaintiff was "very agitated" and unable to sit still in the office and somewhat aggressive in her behavior. (Tr. 356). She expressed a feeling of having panic attacks during another visit that month. (Tr. 358).

Dr. Laviolette completed another RFC assessment form on May 15, 2000. She found Plaintiff to have significant exertional and other limitations that would preclude her from performing light work. (Tr. 298-301). The ALJ dismissed the findings with an explanation that Dr. Laviolette had not performed a thorough examination of the claimant within the past year and a notation of the ALJ's belief that the assessment was inconsistent with the objective evidence and inconsistent with Dr. Laviolette's cursory examinations. (Tr. 15).

Dr. Lloyd Bellah conducted a psychiatric evaluation, at the request of the agency, in May 2000. (Tr. 333-35). He opined that Plaintiff had "some functional capacity" but "may or may not be able to keep up a full day's schedule due to complaints of fatigue." (Tr. 334). He said her complaints "seem to be centered around physical problems rather than mental problems," but she had a histrionic personality style, and it is "possible" that patients with that personality style would have a "tendency to elaborate and exaggerate symptoms for psychological gain." He did not find such exaggeration, but he said it could not be ruled out. He found Plaintiff to have fairly good communication skills, and he believed that she could relate to others and deal with the public in a reasonable fashion. (Tr. 335). She would, though, have difficulty dealing with work stress, but she could likely function independently due to her cognitive ability. Dr. Bellah said he could not comment on Plaintiff's ability to function in a physical capacity, but he did not see such limitations at that time. Dr. Bellah assessed Plaintiff's Global Assessment of Functioning ("GAF") at 35, which indicates a substantial amount of impairment. (Tr. 334). The ALJ found that the GAF rating was "totally inconsistent" with other evidence from the evaluation. That finding is a reasonable one.

The agency had Dr. John Underwood, an internist, examine Plaintiff in June 2000. (Tr. 338-39). Plaintiff demonstrated a good range of motion in her ankles, knees, hips, back, shoulders, wrists and other joints. She had some decreased grip in her right hand and complained of stiffness with movement of her right shoulder. Her neck was supple and she could flex it up and down and rotate it 45 degrees in either direction. Dr. Underwood did state a belief "that this patient does have a history compatible with fibromyalgia and she has been treated for depression and does have a sad affect." He added: "She has been chronically disabled for at least ten years." (Tr. 339). He then completed a medical assessment form and indicated that Plaintiff could lift no weight frequently or occasionally because of her fibromyalgia. Plaintiff was also found to be significantly limited in her ability to stand/walk and sit. Other postural and functional impairments were also noted. (Tr. 340-341). The ALJ wrote that Dr. Underwood's opinion that Plaintiff could lift nothing was "highly inconsistent" with the examination in which Plaintiff showed a good range of motion. Thus, the assessment was afforded little weight. (Tr. 16).

The ALJ called upon Dr. Baer Rambach to give an opinion as a medical expert. Dr. Rambach reviewed the medical records and answered written questions. He was asked whether there were objective signs and findings to indicate fibromyalgia. He wrote that he agreed that Plaintiff "probably has some element of fibromyalgia," but he noted signs of "symptom magnification from time to time." There were, however, "objective signs pointed out by physicians" that indicated fibromyalgia.

Dr. Rambach was also asked to list the specific functional limitations imposed by Plaintiff's impairments. (Tr. 347-50). He opined that Plaintiff "should be able to function at least in a sedentary type of job with limitations of no more than five-10 lbs. occasional lifting & carrying and being able to alternate between standing & sitting as necessary." He added that Plaintiff "should be able to use her hands for normal light activities." (Tr. 347-49). He offered additional comments that Plaintiff had "significant psychological problems" that he believed were much more of a problem than orthopedic issues. He added: "The fibromyalgia should not prevent her from engaging in some sort of sedentary job on a full time basis." (Tr. 350).

The ALJ acknowledged the finding of objective signs to support a diagnosis of fibromyalgia, but she emphasized the observation of occasional symptom magnification. With respect to Dr. Rambach's finding that Plaintiff could function at only a sedentary level, the ALJ said the finding was "contradictory" because the report also said Plaintiff could use her hands for "normal light activities." (Tr. 16). It appears to the undersigned, however, that the physician was using the word "light" in the generic rather than legal sense of 20 C.F.R. § 404.1567(b) when he described the ability of the Plaintiff to use her hands. This and the other efforts to discount the medical expert's findings and opinion are not convincing and appear to strain for any interpretation that would disfavor the claimant.

Dr. Laviolette completed another assessment form in October 2001. (Tr. 401-05). The assessment is on a pre-printed form provided by Met Life, which apparently provides disability-related benefits to Plaintiff. Dr. Laviolette indicated that Plaintiff's impairment

was of moderate intensity and that she should avoid stairs, balancing, stooping and similar physical activities. (Tr. 403). She recorded ten dates of treatment to that point in the 2001 calendar year. Dr. Laviolette concluded that Plaintiff would never be able to return to her former job because she was physically and emotionally unable to work. (Tr. 404). The ALJ dismissed the assessment on the grounds that it was dated after the date last insured and "was not supported by the objective evidence." (Tr. 17).

**Testimony**

Plaintiff testified she left her job as a shipping clerk in June 1995 because of continuing difficulties caused by fibromyalgia, which she had suffered from for 3-4 years before then. Her physician had recommended she leave before that time. Plaintiff said she did not want to give up and kept trying to work until she stayed as long as she believed she could. Plaintiff recounted the many forms of medical treatment, counseling, breast reduction, injections and other attempts she had made to relieve her symptoms. She had, shortly before she testified in February 2003, undergone joint replacement surgery of her right thumb because of arthritis. (Tr. 411-16).

Plaintiff testified she still had cervical problems and experienced numbness from time to time and pain all of the time. Her fibromyalgia was also continuing to cause problems, especially in her lower back, between her shoulders, and even underneath her breast bone. Plaintiff said she once had days when she would not have the pain, but she now experiences it every day. Her medicine helps "somewhat." She has tried to go without pain medicine at times, but she was unable to do it for more than a month or so. (Tr. 416-17). Plaintiff

testified she had also been taking medication for depression and anxiety since 1995. She added that she has panic attacks two or three times a month, with each one lasting from an hour to half a day. Plaintiff said she was able to take care of her personal needs such as bathing and dressing. She is able to dust and do other chores that do not require pushing and pulling, but her husband or other people help her with vacuuming, cooking and heavier chores. Her husband, with her as company, does the grocery shopping. (Tr. 418-19).

Plaintiff said that in the past she could walk four miles in about an hour, but now she can walk no more than half a mile without resting, and it would take her about thirty minutes to cover that distance. She estimated she could sit fifteen or twenty minutes without having to get up and move around or assume a different position. She spends most of the day lying down. (Tr. 420-21). Plaintiff said that she nonetheless tries to walk three times a week to avoid losing muscle tone. (Tr. 422).

Plaintiff estimated that she could, if she tried very hard, write enough to fill a page, but her hand problems prevent her from using her computer for more than five or ten minutes. (Tr. 422-24). Plaintiff recounted how her treating physician had changed her medications several times in an effort to give her relief, but Plaintiff did not believe most of the medications helped. She said she had also tried the Pain Care clinic and therapy for quite some time, but she was told that they could not help any more than they already had. (Tr. 425-27).

**Analysis of Issues Raised**

The ALJ recognized that Plaintiff may experience some degree of discomfort from time to time, but she found that was not inconsistent with the performance of light work activity, reduced by the inability to constantly/repetitively use her hands and moderate limitation in maintaining attention and concentration for extended periods. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though a job may require lifting of only very little weight, it will still be classified as light rather than sedentary if it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. A person must have the ability to do substantially all of these activities to be found capable of performing the full range of light work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Plaintiff's first two assignments of error are that the ALJ failed to adequately assess her RFC and failed to assign adequate weight to the medical evidence. Neither the ALJ nor the Commissioner (in her brief to this court) have pointed to findings or an assessment by any treating or consultative physician that positively support a conclusion that Plaintiff can perform the exertional requirements of light work. To the contrary, the several physicians who have assessed Plaintiff over the several years involved in this lengthy case have found that Plaintiff is unable to lift the amount of weight required by light work or perform the walking and standing requirements of light work.

The only evidence that indicates Plaintiff could perform at those levels came from a State agency physician, Dr. Charles Black, who did not examine Plaintiff but did review medical records available to him in 1996. He checked boxes on a form to indicate that Plaintiff could frequently lift 25 pounds and occasionally lift up to 50 pounds. He also found that she could stand/walk and sit six hours a day and that she was unlimited in her ability to push and/or pull with hand or foot controls. (Tr. 124). He also checked a box to indicate that he did not have a treating or examining source statement in the records he examined to form his conclusion. (Tr. 129). The ALJ found that the State agency medical examiner's opinion was "well supported" and "not inconsistent" with the findings of the ALJ. An ALJ is required to consider the opinions of a State agency physician, but he is not bound by them. Social Security Ruling 96-6p.

The medical evidence other than Dr. Black's 1996 paper review includes not a single statement from a treating or consultative physician (all of whom actually examined Plaintiff) that Plaintiff could perform anywhere near the levels suggested by Dr. Black. Dr. Black also indicated that Plaintiff had no postural or environmental limitations (Tr. 125-27), but all or most of the physicians who actually examined Plaintiff found that she had several such limitations of significant degrees. Under these circumstances, the ALJ's heavy reliance on the State agency physician's report was not justified.

The ALJ dismissed virtually all of the treating physician's opinions and afforded them little to no weight. The opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining

disability. The treating physician's opinion on the nature and severity of a patient's impairment will be given "controlling weight" if it is well supported by medical evidence and not inconsistent with other substantial evidence. Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000).

The ALJ may, however, discount the weight of a treating physician's opinion when good cause is shown. Good cause exists when a treating physician's opinion is conclusory, unsupported by medically acceptable techniques or is otherwise unsupported by the evidence. Newton, 209 F.3d at 455-56. The regulations provide that the Commissioner "will always give good reasons" for the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2). The regulation specifically requires consideration of:

(1) the physician's length of treatment of the claimant;

(2) the physician's frequency of examination;

(3) the nature and extent of the treatment relationship;

(4) the support of the physician's opinion afforded by the medical evidence of record;

(5) the consistency of the opinion with the record as a whole; and

(6) the specialization of the treating physician.

Even if the treating source's opinion is not well supported by medically acceptable evidence or is inconsistent with other substantial evidence in the record, that means only that the opinion is not entitled to controlling weight. It is still entitled to some deference and must be weighed using all of the factors in the above list. Newton, 209 F.3d at 456. And

Newton made clear that "an ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist." Id. The Newton case was remanded to permit that analysis.[1]

The ALJ faulted Dr. Laviolette's opinions for being what the ALJ perceived as inconsistent, based on a cursory examination, or not supported by objective evidence. The record shows that Dr. Laviolette had a long-term treatment relationship with Plaintiff and examined and treated her on several occasions. Dr. Laviolette's assessments, often completed on insurance-company provided forms, do not always provide specific, detailed reasons for her findings, but many of those forms do not ask for the articulation of such reasons, and the findings with respect to the limitations are not inconsistent with the diagnoses and observations contained in Dr. Laviolette's treatment notes. The ALJ faults Dr. Laviolette's opinions for being inconsistent with her own examinations and other objective evidence, but she did not herself articulate what those inconsistencies are thought to be.

Plaintiff also challenges the ALJ's assessment of her credibility. The ALJ wrote that she allowed for some of the subjective complaints and limitations testified to by Plaintiff, but she found the claims credible only to the extent they were consistent with the RFC assessed by the ALJ. The ALJ did not point to any specific reasons that she found the testimony lacking in credibility. The courts are ordinarily quite deferential to the credibility

---

[1] Later cases have stated that the six-factor review is required only when there is an absence of competing first-hand medical evidence. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Nall v. Barnhart, 78 Fed. Appx. 996 (5th Cir. 2003). Dr. Black's report is competing, but it is not first-hand.

assessments of an ALJ when those assessments are supported by the articulation of sound reasons or the reasons are evident from conflicts between the testimony and objective medical evidence. A credibility assessment must, however, be supported by some form of substantial evidence. Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). Plaintiff's testimony does not on its face demonstrate any significant reasons to doubt it. The testimony is also largely consistent with and supported by the many medical reports from her treating physician and the consultative examiners. Under those circumstances, and absent the articulation of reasons to warrant the discounting of Plaintiff's credibility, the court is not justified in affording its ordinary deference on the credibility assessment.

The medical evidence in this case, as it is in most, reveals that the many physicians who examined Plaintiff did not issue identical findings and opinions. There will always be some inconsistencies, but Dr. Laviolette's findings are not significantly out of line with those made by the other physicians. More important, none of the physicians who examined Plaintiff made findings that she could perform at the level of the RFC found by the ALJ. And the mere fact that the ALJ may be able to find fault with portions of medical opinions indicating an ability to perform sedentary or less work does not provide substantial evidence to support a finding that the claimant can perform light (or medium or heavy) work. There must be some positive, "substantial evidence" to support that finding. The State agency physician's report, based on a review of medical records that did not even include a statement from a treating source, is simply insufficient to provide that degree of evidence in the face

of numerous contrary reports from physicians who actually examined Plaintiff and testimony from Plaintiff that is largely consistent with those first-hand medical observations.

**Conclusion**

Fibromyalgia is a controversial diagnosis that many people believe is not a real condition or believe is purely psychological. Be that as it may, several physicians in this case have stated that there is positive evidence to support the diagnosis and that it imposes limitations on Plaintiff inconsistent with the RFC found by the Commissioner. The overwhelming medical evidence in that regard deprives the Commissioner's decision of substantial evidence and requires that the Commissioner's decision be reversed. Accordingly, the court need not address the other assignments of error raised by Plaintiff.

On remand, Plaintiff and the agency may further explore any other relevant matters. See 20 C.F.R. § 404.983 (following a federal court remand, "[a]ny issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case."). See also Social Security Law and Practice, § 55:74 (there is ordinarily "no limit on a claimant's supplementing the record on remand" after a sentence four or sentence six remand).

Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision to deny benefits be **REVERSED** and that this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

## Objections

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ. Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed.R.Civ.P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 30th day of June, 2005.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

cc: Judge Walter